UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA EX REL.
RON ADAMS, K52347,

    Petitioner,

v.

KIMBERLY BUTLER, Warden,
Menard Correctional Center,

    Respondent.

No. 14 C 8324

Judge Thomas M. Durkin

**MEMORANDUM OPINION AND ORDER**

Ron Adams was convicted of first degree murder and battery with a firearm, and is serving consecutive prison terms for those crimes of 45 and 15 years, respectively, at the Menard Correctional Center in Menard, Illinois, where he is in the custody of Warden Kimberly Butler. *See* R. 1. Adams seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *See id.* The Warden answered the petition arguing that it should denied. R. 12-1. For the following reasons, Adams's petition is denied, and the Court declines to issue a certificate of appealability.

**Background**

**I.    Facts**

Shortly after midnight on July 5, 2002, Aaron Newman was shot and killed, and Martice Chapman was also shot but survived, at a party attended by about 50-100 people in the alley bounded by the blocks of West Douglas Boulevard, South Millard Avenue, West 13th Street, and South Central Park Avenue, in Chicago.

Adams was discovered shortly after the shooting on the same block of South Millard Avenue where the party occurred, having suffered multiple gunshot wounds himself, and was taken to the hospital. Adams and his co-defendants, brothers Terrance and Harvey Space, were charged with shooting Newman and Chapman, and simultaneously tried before three separate juries. Pursuant to motions in limine, either one or two of the three juries were removed from the courtroom for the presentation of evidence that the trial court previously determined would be prejudicial to the defendant for whom the jury was responsible for rendering a verdict. Adams's jury heard the following testimony:

Derrick Smith testified that he was at the party talking to Newman. R. 12-8 at 83-85. Chapman, the shooting victim who survived, testified that he was also at the party standing near Newman. R. 12-7 at 14. Smith testified that Terrance Space rode through the alley on a bike and stopped to talk with Newman. R. 12-8 at 86-89. According to Smith, Newman and Space had an unfriendly conversation, and Space rode off back down the alley. *Id.* at 92. According to both Smith and Chapman, about 20 minutes later a person wearing a hooded sweatshirt with the hood up and covering his face walked down the alley with his hands in his pockets. *Id.* at 93-95; R. 12-7 at 17. Smith testified that when the man got within four or five feet of him and his friends, he took off his hood and pulled a handgun out of his pocket. *Id.* at 95. Smith identified Adams as the shooter, and said that he had a 9 mm Ruger gun. *Id.* at 95-96, 157. Chapman also testified that the person wearing the hood had a gun, but Chapman did not identify the shooter. R. 12-7 at 18. After Chapman was

shot he ran into the backyard of one of the houses on the alley and was helped inside. *Id.* at 20-21. He was eventually taken to the hospital. *Id.* Chapman testified that he did not see any other shooter besides the person in the hood before he took cover in the house. *Id.* at 22.

Smith testified that he ran and took cover behind some garbage cans. From that vantage point he saw Terrance Space enter the area through a vacant lot holding a Tech 9 gun. R. 12-8 at 97-98. Smith then saw Terrance Space fire his gun at Newman. *Id.* at 98-99. Smith also saw the third co-defendant, Harvey Space, in the alley firing a "large caliber handgun" in Newman's direction. *Id.* at 99-100, 102. Smith testified that when Adams and the Space brothers left that particular section of the alley, Smith came out from behind the garbage cans and went down a "gangway," or a passageway between buildings, to where Newman was and found that he had been shot and was unconscious. *Id.* at 103-04. Smith continued to hear gunshots back in the alley. *Id.* at 104. Smith did not inform police that he knew who the shooters were until he identified Adams and the Space brothers from photo arrays at the police station on July 22, 2002. *Id.* at 114-17, 176-77. Smith also identified them from line-ups on August 8 and November 13, 2002, and September 12 and October 1, 2003. *Id.* at 117-23.

Smith was cross-examined with prior statements he made to police and the grand jury. Before the grand jury, Smith testified that he either did not know what caliber or brand of guns the shooters used, or identified the brand as something other than what he testified to at trial. *Id.* at 150-60. Smith's statement to the police

3

also referenced "another guy in the vacant lot," but at trial Smith testified that this was incorrect. *Id.* at 167. At trial Smith testified both that he was not given the opportunity to review "each individual page" of the written statement he signed, *id.* at 168, and that he read the statement and signed every page. R. 12-9 at 15.

Laquita Thomas lived in an apartment building on the alley and attended the party. R. 12-6 at 75-78. Thomas was friends with Newman and standing near him in the moments before he was shot. *Id.* at 79, 89. Thomas testified that she saw a person walk down the alley wearing a hooded sweatshirt with the hood up. *Id.* at 80, 92. Thomas also testified that soon after she saw this person, at about 12:15 a.m., "a lot" of gunshots were fired in the alley, but she did not see who fired the shots. *Id.* at 80-81, 91, 97. When the gunshots started, Thomas testified that she ran and did not see who the shooter was or who was shot. *Id.* at 92. Thomas also testified that she knew Adams from the neighborhood, and that he was at the party, but denied that he shot Newman. *Id.* at 93-94, 96-97.

On July 10, several days after the shooting at the party, Thomas spoke with Sergeant Don Jerome (who was a detective at that time) about the shooting. *Id.* at 99-100. Thomas denied telling Sergeant Jerome that she saw Adams shoot Newman. *Id.* at 101. On July 21, Thomas went to the police station to view a photo array from which she identified Adams as the person who shot Newman. Thomas signed the photo array document with an arrow identifying Adams, but at trial she denied making this identification. *Id.* at 102-05. Thomas testified that Sergeant Jerome told her who to identify and where to sign the photo array document. *Id.* at

4

110-11. Contrary to Thomas's testimony, Sergeant Jerome testified that Thomas told him that Adams shot Newman, and that she identified him from a photo array on July 21 and from a line-up on August 8. R. 12-10 at 148-50, 161-62.

Thomas also denied viewing a line-up at the police station on August 8 and identifying Adams as the person who shot Newman. R. 12-6 at 111-12. Thomas also denied giving a written statement to Assistant State's Attorney Tony Garcia on September 2. *Id.* at 114-15. During Thomas's testimony the State impeached Thomas with a written statement dated September 2, 2002, with Thomas's signature, also signed by Detective Jerome and ASA Garcia. *Id.* at 119-20.

ASA Garcia testified that on September 2 he spoke with Thomas at the police station, and helped her prepare a handwritten statement. *Id.* at 168-72. In that statement Thomas identified Adams as the person who shot Newman. *Id.* at 180. She also told ASA Garcia that she was able to recognize Adams because the hood of his sweatshirt was pulled back. *Id.* She also stated that she viewed a photo array and a line-up and identified Adams as the shooter in both instances. *Id.*

Sergeant Jerome arrested Adams on August 8 based on Thomas's identification. R. 12-10 at 164-69. Adams was using crutches when he was arrested. *Id.* at 168. Sergeant Jerome's colleague read the Miranda warnings to Adams and Adams agreed to speak with them. *Id.* at 169. Sergeant Jerome testified that Adams told him that he was robbed and shot on the night of July 4 and went to the UIC Hospital. *Id.* Sergeant Jerome contacted UIC and learned that Adams was not admitted there that night. *Id.* at 169-70. When Sergeant Jerome confronted Adams

5

with that information, Adams admitted that he was shot while walking to a party near Millard and Douglas Avenues and was taken to Cook County Hospital. *Id.* at 170.

Terrell Collier testified that the night of the party, he was driving on the block of Millard Avenue where the party occurred, when he heard gun shots. *See People v. Adams*, 914 N.E.2d 490, 496 (Ill. 2009); R. 15 at 5. He then saw Adams on the ground wearing shorts and a t-shirt, but not a hooded sweatshirt. *See Adams*, 914 N.E.2d at 496; R. 15 at 5. He also saw that Adams had been shot, so he took him to the hospital. *See Adams*, 914 N.E.2d at 496; R. 15 at 5. He also testified that Adams did not have a gun when he found him. *See Adams*, 914 N.E.2d at 496.[1]

Faran Bokhari, a surgeon at Cook County Hospital, testified that he treated Adams on July 5, 2002 for four gunshot wounds—one each to his legs, his left arm, and right back. R. 12-10 at 35-37. Adams received a chest tube on his right side due to a collapsed lung, had multiple x-rays and cat scans, and an angiogram of his left leg to determine whether the leg had sufficient blood supply. *Id.* at 38.

Kathleen Gahagan was a forensic investigator at the scene of the shooting. R. 12-7 at 77, 80-81. She testified that a shotgun and many bullet casings of five different calibers were recovered from the scene. *Id.* at 93-113. Kurt Zielinski, a forensic scientist with the Illinois State Police, analyzed the ballistics evidence recovered at the scene. R. 12-10 at 43-44, 52. He testified that he determined that

---

[1] The State did not include Collier's testimony in the record of Adams's case. The Court relies on Adams's brief and the state appellate court opinion for this testimony.

there were at least five guns used during the shooting: a .380 automatic handgun; .45 automatic handgun; 9 millimeter Luger handgun, a .40 Smith and Wesson handgun; and a shotgun. *Id.* at 73-74. Julie Wessel, another forensic scientist with the Illinois State Police, testified that she found fingerprints on the shotgun, but none of the prints belonged to Adams or the Space brothers. R. 12-10 at 89, 96-102.

Detective James Egan testified that a person named Christopher Saunders was discovered to be in possession of a handgun that matched some of the bullet casings found at the scene. R. 12-11 at 59, 61. Detective Egan testified that his investigation eliminated Saunders as a potential suspect in the shooting, but did not explain why he did so. *Id.* at 61-62.

## II. Procedural History

At the close of the State's case, Adams moved for a directed verdict, which was denied. R. 12-11 at 188-89. Adams also objected to the jury being given Illinois Pattern Instructions 5.03 and 5.06, which address a defendant's "accountability" for the actions of others. These two instructions provide the following:

> **5.03 Accountability.** A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense.
>
> **5.06 Defendant's Responsibility For Act Of Another—Actor Not Prosecuted, Etc.** A person who is legally responsible for the conduct of another may be convicted for the offense committed by the other person even though the other person, which it is claimed committed the offense has not been prosecuted.

The trial court gave these instructions over Adams's objection, holding with respect to instruction 5.06 that "there is evidence in this trial . . . to support the giving of this instruction." R. 12-11 at 203. Adams did not renew this objection in his post-trial motion. *See* R. 12-2 at 60.

Adams appealed his conviction through counsel, which was denied on August 14, 2009. *See Adams*, 914 N.E.2d 490. In his appeal, Adams raised the following seven issues: (1) the evidence that there were five shooters created reasonable doubt, *see* R. 12-2 at 21; (2) the eyewitness identifications of Adams were unreliable, *see id.* at 23; (3) Adams was denied a fair trial because four jurors' notebooks went missing during the trial and the trial court would not permit jurors to share notes, *id.* at 26; (4) the trial court erred in instructing the jury regarding accountability for uncharged accomplices without requiring evidence that any such accomplices existed, *id.* at 29; (5) the trial court erred in denying Adams's motion to quash his arrest and suppress evidence based on a warrantless entry into his home, *id.* at 30; (6) the trial court erred in excluding evidence about the location of Saunders's arrest, *id.* at 32; and (7) the trial court erred in admitting double hearsay statements, *id.* at 34. Adams also had counsel file a petition for leave to appeal with the Illinois Supreme Court, which renewed arguments (1), (3), (4), and (5). *See* R. 12-2 at 66-67. The Illinois Supreme Court denied Adams's petition on November 25, 2009. *See People v. Adams*, 920 N.E.2d 1074 (Ill. 2009).

Adams, acting pro se, then filed a petition for post-conviction relief in the Illinois Circuit Court, *see* R. 12-3 at 1-15, which was denied on October 8, 2010. *See*

*id.* at 16-18. Adams filed an appeal though counsel, arguing that his trial counsel was ineffective. *See* R. 12-3 at 23. The appellate court denied his appeal on October 30, 2013. *See People v. Adams*, 2013 WL 5873389 (Ill. App. Ct. 1st Dist. 2013). Adams then renewed his ineffective assistance of counsel argument in a petition for leave to appeal with the Illinois Supreme Court filed through counsel, *see* R. 12-5 at 46, which was denied on May 28, 2014. *See People v. Adams*, 8 N.E.3d 1049 (Ill. 2014).

Adams filed his petition in this Court on October 22, 2014. *See* R. 1. He argues that his petition should be granted on the following four grounds: (1) the evidence against him was insufficient, *id.* at 9; (2) the trial court erred in instructing the jury that it could convict Adams if it found that he was liable for the conduct of another person, *id.* at 11-12; (3) his trial counsel was ineffective for failing to sufficiently investigate and argue that evidence of Adams's injuries on July 5 contradicted witness testimony that the shooter ran from the scene, *id.* at 15; and (4) his appellate counsel was ineffective for failing to raise a claim of ineffective assistance of trial counsel on direct appeal, *id.* at 18.

## Analysis

I. **Ground One: Sufficiency of the Evidence**

Adams argues that there was insufficient evidence supporting his conviction. Specifically, in support of this argument, Adams contends the following: (a) Smith was not a credible witness; (b)(1) ballistics evidence showing that there were at least five guns used during the incident indicates that there was a "third-party

9

culprit"; (b)(2) the fingerprints found on the shotgun did not match Adams; (c) Saunders was found in possession of one of the guns used during the shooting; and (d) Adams was also shot on July 5. R. 1 at 9-10. In summary, Adams argues that "the State never mentioned or attempted to identify any of the other shooters, they never attempted to prove that [Adams] solicited, ordered, abetted, or attempted to aid any of the other shooters. Neither [Adams] not the Space brothers were proven to have fired the murder weapon or proven to have shared a common criminal design with the person that did." *Id.* at 10-11.

As the appellate court held, none of these arguments changes the fact that "credible testimony was given that [Adams] was one of the shooters." *Adams*, 914 N.E.2d at 504. Although Smith's credibility was impeached with inconsistencies between his statements to the police and his trial testimony, none of these inconsistencies made his testimony incredible as a matter of law. Additionally, the evidence Adams points to—ballistics and fingerprint evidence indicating that there could have been a fourth shooter, Saunders's possession of one of the guns used in the shooting, and the gunshot wounds Adams suffered on July 5—does not make it any less likely that Adams was also involved in the shooting. Smith's testimony that Adams was the shooter, and ASA Garcia's testimony that Thomas also identified Adams as the shooter despite her trial testimony to the contrary, was a sufficient evidentiary basis for a "rational trier of fact" to have found Adams guilty beyond a reasonable doubt. *See Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012). Moreover, Adams has not identified any evidence or made any argument sufficient to show

that the appellate court's affirmance of the jury's verdict was "objectively unreasonable." *Id.*; *see also id.* ("a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court"). Thus, the Court rejects the first ground of Adams's petition.

## II.     Ground Two: Jury Instruction

Adams argues that the trial court's decision to instruct the jury regarding accountability for the actions of others was error. Although Adams objected to the instruction during trial, Adams did not raise it in a post-trial motion. By failing to do so, the appellate court held that Adams forfeited this argument. *See Adams*, 914 N.E.2d at 502 (citing *People v. Enoch*, 522 N.E.2d 1124, 1130 (Ill. 1988) ("*Both* a trial objection and a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial.") (emphasis in original)); *see also People v. Herron*, 830 N.E.2d 467, 472 (Ill. 2005) ("Generally, a defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a post-trial motion.").

The Warden argues that the appellate court's holding "is an independent and adequate state law ground of decision barring habeas review." R. 12-1 at 13. A habeas claim "will be procedurally defaulted—and barred from federal review—if the last state court that rendered judgment 'clearly and expressly' states that its judgment rests on a state procedural bar." *Lee v. Foster,* 750 F.3d 687, 693 (7th Cir.

11

2014) (citing *Harris v. Reed,* 489 U.S. 255, 263 (1989)). "Accordingly, [courts do] not entertain questions of federal law in a habeas petition when the state procedural ground relied upon in the state court is independent of the federal question and adequate to support the judgment." *Lee,* 750 F.3d at 693 (citing *Coleman v. Thompson,* 501 U.S. 722, 729 (1991)). "An independent state ground will be found when the court actually relied on the procedural bar as an independent basis for its disposition of the case." *Lee,* 750 F.3d at 693. "A state law ground is adequate when it is a firmly established and regularly followed state practice at the time it is applied." *Id.*

The Seventh Circuit has recognized that "Illinois law requires a convicted defendant to include any and all claims of error in a post-trial motion for a new trial," and "failure to comply with this requirement amounts to a waiver of the claim." *Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005). The Seventh Circuit has also held that a failure to properly raise an objection to a jury instruction with the trial court is an independent and adequate state law ground that bars substantive federal habeas review. *See Lostutter v. Peters*, 50 F.3d 392, 394-95 (7th Cir. 1995) ("the district court [properly] refused to address its merits because the state appellate court's holding that he had waived his jury instruction claim established an independent and adequate state ground for the decision"); *see also Mitchell v. Williams*, 2015 WL 5722447, at *6 (N.D. Ill. Sept. 29, 2015) (holding that under Illinois law "a party forfeits an argument on appeal by not presenting it at trial. Consequently, the Illinois appellate court's determination rested on an

independent and adequate state ground."). Furthermore, Adams has not made any argument that would excuse his procedural default. He has not "demonstrate[d] both cause for and prejudice stemming from [his] default," or "that denial of relief will result in a miscarriage of justice." *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004). Therefore, Ground Two of Adams's petition is procedurally barred by an independent and adequate state law ground.[2]

Additionally, even if Adams's objection to the jury instruction at trial was sufficient to preserve that claim, it is procedurally defaulted because he failed to argue during his state proceedings that the jury instruction was constitutionally deficient. Adams is required to present all his grounds for habeas relief through one complete round of state court review. *See Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014). During his state proceedings, Adams argued that the jury instruction was improper under state law. In his brief on appeal, he cited only Illinois case law, and never referenced the Due Process Clause or any other constitutional principles. Such an argument based on state law alone is insufficient to show that Adams fairly presented his federal claim throughout at least one complete round of state-court review. *See Sanders v. Cotton*, 398 F.3d 572, 580 (7th

---

[2] Although the state appellate court went on to discuss whether the trial court's jury instruction constituted plain error, this "alternative discussion of the claim on the merits does not ameliorate the procedural default." *Mitchell*, 2015 WL 5722447, at *6; *see also Brooks v. Walls*, 279 F.3d 518, 523 (7th Cir. 2002) ("A state court may say something like: 'this argument has been forfeited because not raised in the proper way (such as by an objection to the jury instructions); and the defendant has not established plain error because there was no error at all.' When it does this, it has not abandoned the procedural ground but has instead added a substantive failing to the procedural one.").

13

Cir. 2005); *see also Chester v. Pfister*, 2015 WL 1345767, at *5 (N.D. Ill. Mar. 23, 2015) (holding that argument based on jury instruction error was procedurally defaulted because petitioner "alleged only that his jury instruction claims violated Illinois law"); *Lenoir v. Williams*, 2015 WL 684743, at *7 (N.D. Ill. Feb. 17, 2015) ("[petitioner's] claim based on [an] Illinois Pattern Jury Instruction . . . was not framed as a federal or due process claim on direct appeal not in his PLA to the Supreme Court, and thus [petitioner] has procedurally defaulted this claim"). Thus, Ground Two of Adams's petition is procedurally defaulted for this reason as well.

### III. Ground Three: Ineffective Assistance of Trial Counsel

Adams also argues that the Court should grant his petition because his trial counsel was ineffective. Adams contends that his trial counsel "failed to adequately investigate" facts about Adams's gunshot wounds and call a medical expert, R. 1 at 16, whose testimony "would have completely undermined the [State's] eyewitness testimony that [Adams] was one of the shooters and was seen fleeing the [scene] running[,] [b]ecause . . . [Adams's] leg was broken." *Id.* at 17. The state appellate court found that Adams's trial counsel's actions were not "objectively unreasonable," and even if the failures to which Adams cites demonstrated deficient performance by trial counsel, Adams was not prejudiced by them. *See Adams*, 2013 WL 5873389, at *4.

To prevail on a claim of ineffective assistance, Adams must demonstrate (1) that counsel provided deficient performance, meaning his representation "fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668,

14

688 (1984); and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "Surmounting *Strickland*'s high bar is never an easy task," but on habeas review, establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) "is all the more difficult." *Harrington v. Richter*, 562 U.S. 86, 105 (2011); *see also Murrell v. Frank*, 332 F.3d 1102, 1111 (7th Cir. 2003) ("The bar for establishing that a state court's application of the *Strickland* standard was 'unreasonable' [under § 2254(d)(1)] is a high one . . . ."). Moreover, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that [a habeas petitioner] has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *see also Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."). When the "highly deferential" standards created by *Strickland* and § 2254(d) are applied together, review is "doubly deferential." *Knowles*, 556 U.S. at 123. In such circumstances, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

The state appellate court held that Adams's trial counsel's performance was not deficient for failure to investigate Adams's medical condition or to call a medical expert because evidence of Adams's medical condition was presented to the jury. Dr.

15

Bokhari testified regarding the extent of Adams's injuries, and Sergeant Jerome testified that Adams was on crutches when he was arrested. Considering the evidence of Adams's medical condition that was before the jury, the Court cannot say that the state appellate court unreasonably determined that trial counsel's decisions were reasonable.

Moreover, the state appellate court held that even if Adams's trial counsel should have further investigated Adams's medical condition and called a medical expert, Adams did not suffer prejudice because there was "ample" evidence that Adams was present at the scene and fired a gun at Newman. *See Adams*, 2013 WL 5873389, at *4. Considering Smith's testimony and Thomas's statements to the police that Adams fired a gun at Newman, it was reasonable for the state appellate court to find that a medical expert's testimony would not have altered the jury's calculus. Even if a medical expert had testified that Adams's wounds would have prevented him from running, the jury could have concluded that Adams was shot after he ran out of the alley, since Smith testified that gun shots continued to be fired after that point in time. No evidence was presented that would have made such a conclusion unreasonable. Since Adams cannot show that the testimony of a medical expert would have changed the result of his trial, Ground Three of his petition fails.

**IV.   A Fourth Ground: Ineffective Assistance of Appellate Counsel**

In the last paragraph of the Third Ground of his petition, Adams argues that the Court should grant his petition because his appellate counsel was ineffective for

16

failing to argue that his trial counsel was ineffective. *See* R. 1 at 18. In addressing Adams's post-conviction petition, the state appellate court found that Adams forfeited this ground by not presenting any argument on this point in his appeal, *see Adams*, 2013 WL 5873389, at *2, which as discussed above is an independent and adequate state law basis for denying this ground. Further, Adams did not include this ground in his post-conviction petition for leave to appeal to the Illinois Supreme Court. Therefore, it is procedurally defaulted for failure to present it to the state courts through one complete round of review. Additionally, the claim is meritless because, as discussed above, trial counsel was not ineffective, so appellate counsel could not have been ineffective for failing to raise that argument. Thus, this ground of Adams's petition fails.

## IV. Certificate of Appealability

Lastly, the Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2). Rule 11(a) of the Rules Governing § 2254 Cases provides that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." *See Gonzalez v. Thaler,* 132 S.Ct. 641, 649 n.5 (2012). To obtain a certificate of appealability, a habeas petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This demonstration "includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 483–84 (2000); *see also Lavin v.*

*Rednour,* 641 F.3d 830, 832 (7th Cir. 2011). Here, the Court's denial of Adams's claims regarding the sufficiency of the evidence, propriety of the jury instruction, and ineffective assistance of trial and appellate counsel all rest on application of well-settled precedent. Accordingly, certification of any of Adams's claims for appellate review is denied.

## Conclusion

For the foregoing reasons, Adams's petition, R. 1, is denied, and the Court also declines to issue a certificate of appealability for any of the claims in the petition.

ENTERED:

*[signature: Thomas M. Durkin]*

Honorable Thomas M. Durkin
United States District Judge

Dated: February 29, 2016